**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| DEPUY SYNTHES SALES, INC., | |
| Plaintiff, | |
| v. | CASE NO.: 5:19-cv-1189 |
| BRADLEY A. GORE, | JURY TRIAL DEMANDED |
| Defendant. | |

## COMPLAINT

Plaintiff DePuy Synthes Sales, Inc. (the "Plaintiff" or "DePuy Synthes") files this Complaint against former DePuy Synthes employee Bradley A. Gore (the "Defendant" or "Gore"), and in support thereof avers as follows:

## INTRODUCTION

1.      This case arises out of Gore's efforts to gain an unfair competitive advantage and convert DePuy Synthes' business and valuable customer relationships to a competing distributorship beginning with breaches of his fiduciary obligations as a DePuy Synthes employee and continuing after his resignation, in violation of his contractual obligations to DePuy Synthes and in flagrant disregard of DePuy Synthes' demands that he cease such activities.

2.      Through his actions, Gore has interfered with and converted DePuy Synthes' valuable relationships with customers, including surgeons, from Gore's former DePuy Synthes sales territory and DePuy Synthes' associated goodwill, exploited DePuy Synthes' confidential and trade secret information, and deprived DePuy Synthes of the protections warranted in exchange for its investments in Gore's training and education.

1

3.     Gore's unlawful activities have caused significant damage to DePuy Synthes, including, among other things, financial harm and damages caused by the conversion of DePuy Synthes' business in Gore's former DePuy Synthes sales territory as well as substantial and irreparable harm to DePuy Synthes' customer relations and goodwill and by his exploitation of DePuy Synthes' confidential and trade secret information.  Gore and those acting in concert with him have also been unjustly enriched by this unlawful conduct, and that harm, damages, and unjust enrichment will continue.  DePuy Synthes files this Complaint to remedy the harms caused by Gore's unlawful activities through, among other remedies, an award of compensatory and punitive damages, attorney's fees and costs, disgorgement, an accounting, and all other appropriate legal and equitable relief.

## PARTIES

4.     Plaintiff DePuy Synthes Sales, Inc. is a Massachusetts corporation with its principal place of business in Raynham, Massachusetts and is the sales arm for the DePuy Synthes family of companies in the United States for all product lines, including, but not limited to, the products for which Gore was responsible during his employment with DePuy Synthes.

5.     Upon information and belief, Defendant Bradley A. Gore is an adult citizen of the State of Texas who resides and is domiciled at 1248 Links Lane, San Antonio, Texas 78260.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, who are citizens of different states, and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  The Court has personal jurisdiction over Gore because, among other things, he resides and is domiciled in this judicial district and because a substantial part of the conduct at issue occurred in this judicial district.

7.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Gore resides in this judicial district, because a substantial part of the events giving rise to DePuy Synthes' claims occurred here, and because a substantial part of the property subject to those claims is situated here.

## FACTS SUPPORTING DEPUY SYNTHES' COMPLAINT

### Background and DePuy Synthes' Protection of Its Legitimate Business Interests

8.     DePuy Synthes is a worldwide leader in the medical device industry and designs, manufactures, markets, and sells medical products, including implants and instrumentation and biologics, used for, among other things, internal and external fixation of bone fractures, joint reconstruction and replacement, spinal and facial surgery, and sports medicine.

9.     DePuy Synthes' customers include, but are not limited to, hospitals, hospital employees who influence or may influence the use or purchase of medical devices from DePuy Synthes, including material management, operating room, sterile processing, and related personnel, and physicians who use or may use the devices supplied by DePuy Synthes, and their partners, employees, and staff nurses.  Oftentimes, DePuy Synthes' customer relationships are common to multiple, if not all, of DePuy Synthes' product lines.  Many of DePuy Synthes' customers are part of health systems or integrated delivery networks (known as IDNs) or are affiliated with group purchasing organizations (known as GPOs) with coverage outside of a geographic area aligned to a particular Sales Consultant or Regional Manager, and DePuy Synthes' physician customers often have privileges at accounts within and outside of geographies aligned to a particular Sales Consultant.

10.     The medical device industry is highly competitive, and the protection of DePuy Synthes' confidential and trade secret information, customer relationships, investments in specialized training and education, and goodwill are vital to prevent competitors or would-be

competitors from obtaining an unfair competitive advantage and from exploiting the investments DePuy Synthes has made in not only research and development but also the formation and expansion of customer relationships and market share, the development of goodwill, and the recruitment, training, education, and development of a knowledgeable sales force.

11.     DePuy Synthes markets and sells its trauma products through a sales force that is generally comprised of Sales Consultants who have primary responsibility for providing coverage to accounts and healthcare providers within their assigned territory or teams as well as responsibility for providing coverage to accounts and healthcare providers in neighboring territories.  Sales Consultants often work as members of teams, some of which are managed by Team Leads, and they report to Regional Managers who, in turn, report to Area Vice Presidents, who in turn report to the VP of Sales of DePuy Synthes.

12.     DePuy Synthes generally pays its Sales Consultants on a commission basis along with other incentives based upon, among other things, growth and attainment of sales goals (also known as quotas) and as set forth in DePuy Synthes' annual compensation plans.

13.     Sales Consultants are expected to inform surgeons on the safe and effective use of DePuy Synthes' products.  Accordingly, Sales Consultants' relationships with physician customers and other related staff are among the key factors necessary to grow and maintain DePuy Synthes' business and market share.

14.     DePuy Synthes invests significant time, effort, and money to develop confidential and trade secret information, products and services, innovative solutions, training and professional education programs, customer relationships, and related goodwill.  To protect its investments, DePuy Synthes requires all sales employees to sign agreements that contain obligations, subject to reasonable temporal and geographic limitations, that protect against direct and indirect (i) use or

disclosure of confidential and trade secret information (such as sales and marketing strategies, distribution details, business planning and development, financial information, pricing, sales volume and strategies, purchasing histories, inventory allocation and customer preferences and needs, product development projects, acquisitions, and launches, and personnel information such as compensation and plans with respect to territory or team alignments or expansions); (ii) solicitation and conversion of DePuy Synthes' customers aligned to them in their assigned territories and for whom they had responsibility, to whom they provided coverage, and with whom they had contact; and (iii) interference with DePuy Synthes' relationships with its employees, including through solicitation of or other coordination with employees regarding employment outside of DePuy Synthes.  DePuy Synthes also requires its employees to return, and not retain copies of, all correspondence files, business card files, customer and prospect lists, price lists, product lists, software, manuals, technical data, forecasts, budgets, notes and other material that contain any of this information and other similar information upon separation from DePuy Synthes' employment.

15.    In exchange for entering into these types of agreements, DePuy Synthes promises to provide and does provide those employees with access to DePuy Synthes' confidential and trade secret information, customer relationships, related goodwill, and valuable training and professional education programs in which DePuy Synthes has invested significant time, effort, and money.

16.    In addition to requiring sales employees to enter into these types of agreements, DePuy Synthes takes significant measures to protect its confidential and trade secret information and investments, including obtaining patent protection when available, implementing robust employment policies and practices, setting up physical, role-based or need-to-know, and electronic

limitations to access its information, utilizing a mobile device management program and applications that can be remotely managed and disabled, and utilizing confidentiality agreements with other non-sales employees, with vendors and business partners, and with consultants.

### Gore's Employment with DePuy Synthes

17.    Gore commenced employment with DePuy Synthes as a Sales Consultant in DePuy Synthes' Trauma division on or about August 4, 2015, and, at that time, entered into an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement with DePuy Synthes (the "Agreement," a true and correct copy of which is attached hereto as Exhibit "A").  At all material times during his employment with DePuy Synthes, Gore was aligned to Territory 401, encompassing San Antonio, Texas, where he worked with a team responsible for maintaining and growing DePuy Synthes' relationships with key healthcare facilities, surgeons, and hospital and physician staff.  In 2018, DePuy Synthes' annual revenue for the sales of trauma products in Territory 401 exceeded $2.4 million.

18.    In his role as Sales Consultant, Gore was responsible for selling DePuy Synthes' trauma products to healthcare providers, including large hospital systems and accounts, by maintaining and growing relationships with key physicians as well as hospital system and medical facility personnel who play a role in determining which implants and instrumentation are used in surgeries.  Gore had responsibility to provide coverage for accounts throughout Territory 401 and, if necessary, within adjacent neighboring territories aligned to other DePuy Synthes employees to ensure that DePuy Synthes could provide uninterrupted service to its customers and assist them in providing patient care.

19.    In his role on the team for Territory 401, Gore participated in a city-wide call rotation, shared responsibility for the maintenance and growth of business within the team geography, and collaborated on business strategies for the team and to benefit the entire Region,

including competitive responses and risks and the maintenance and allocation of inventory to support customers' preferences and needs.  Gore was compensated on all sales within Territory 401.

20.     As specified in the Agreement, DePuy Synthes provided Gore with confidential and trade secret information about DePuy Synthes' customers, marketing and sales strategies, product performance information, expansion plans, contracting and pricing strategies, product development and acquisition projects, launches, strategies, competitive responses, inventory strategies, sensitive personnel information regarding compensation and territory and team alignments and expansions, key contacts at customers for the sale of products, and other confidential and trade secret information.  Gore himself was tasked with developing this type of information on DePuy Synthes' behalf during and in connection with his role as Sales Consultant, and he attended meetings and had access to communications through which he gained access to this type of confidential and trade secret information.

21.     Gore regularly received information concerning sales in his assigned territory, including information concerning the volume of such sales, broken down by product type and account at which the sales were made, sales quotas and performance, and comparisons month-over-month and year-to-year, among other things, and was involved in confidential business planning for the assigned territory and beyond.

22.     Gore also received specialized training and education regarding the technical aspects of DePuy Synthes' existing and new products and technologies, the medical procedures in which those products and technologies are used, and techniques for educating and supporting operating room personnel and surgeons so that he could be a valuable resource on the technical

aspects of DePuy Synthes' products and the safe and effective use of those products, and so that he could respond to growing business in his assigned territory and address competitive threats.

<u>**Gore's Contractual Obligations to DePuy Synthes**</u>

23.     In addition to his statutory and common law obligations—including his fiduciary duties as a DePuy Synthes employee which are expressly preserved in the Agreement (*see* Ex. A at ¶ C(20))—in connection with and in consideration of his employment with DePuy Synthes, Gore signed an agreement with DePuy Synthes containing obligations with respect to confidentiality as to DePuy Synthes' confidential and trade secret information, the return of DePuy Synthes' property and "confidential and trade secret information" at the termination of employment, the solicitation of DePuy Synthes' customers for whom he had responsibility or provided coverage, with whom he had contact, and/or for which he was compensated, and the solicitation of other DePuy Synthes employees and interference with the relationships between DePuy Synthes and its employees.

24.     Gore's execution of the Agreement was a condition of his hiring as a Sales Consultant in DePuy Synthes' Trauma division, and DePuy Synthes would not have hired Gore in that role without his execution of it.

25.     The confidentiality provisions of the Agreement specifically provide that Gore "will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during [his] employment…or thereafter" without DePuy Synthes' "prior written consent," (Ex. A at ¶ C(5)), and the term CONFIDENTIAL INFORMATION "means information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to [him] or known by [him] as a result of [his] employment" and "includes, but is not limited to," the following:

8

(a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, products in existence or under development, product performance information, product technical information, product know-how, discoveries, methodologies, algorithms, formulas, protocols, reports, data, results, observations, computer programs, patent applications, strategic plans, hypotheses, research directions, developments, improvements, drawings, designs, specifications, opinions of legal counsel, clinical trials, draft or final regulatory filings, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, customer lists, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to [him] or known by [him] in connection with [his] employment by the COMPANY" (collectively, the "Confidential Information").

(*See* Ex. A at pp. 1-2 (defining the term CONFIDENTIAL INFORMATION) & p. 1 (defining the term COMPANY to mean "individually and/or collectively DePuy Synthes Sales, Inc., Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies" that are "at least 50 percent owned by Johnson & Johnson, either directly or indirectly," and all of "their respective successors and assigns").)

26.     The Agreement also required Gore, "[u]pon termination of [his] employment," to "turn over…all property in [his] possession or custody belonging to" DePuy Synthes, and required that Gore "shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk or drive) relating in any way to the business" of DePuy Synthes "that were entrusted to, created by or obtained by [him] at any time during [his] employment."  (Ex. A at ¶ C(12).)

27.     In the Agreement, Gore agreed not to compete with DePuy Synthes or interfere with DePuy Synthes' customer or employee relationships during and for a reasonable period following his employment with DePuy Synthes.

28.     As to his non-competition obligation, Gore agreed that, "during [his] employment…and for a period of eighteen (18) months after the termination of his employment (whether voluntary or involuntary), [he] will not, directly or indirectly, perform, or assist others to perform, work in [his] TERRITORY for any COMPETITOR in any position and in any location in which [he] could disadvantage any COMPANY or advantage the COMPETITOR by: (a) [his] disclosure or use of [Confidential Information] to which [he] had access; (b) [his] use of the specialized training provided to [him]…; and/or (c) [his] use of CUSTOMER relationships and goodwill."  (Ex. A at ¶ C(6).)  The Agreement defines the term COMPETITOR as "any person or entity including, but not limited to, [Gore] or anyone acting on [his] behalf, (a) that is engaged in or preparing to be engaged [in] research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) [Confidential Information]; (ii) [his] use of the specialized training provided to [him]…; and/or (c) that could benefit from [his] use of the COMPANY's customer relationships and/or goodwill"; defines the term TERRITORY as "any geographic area: (a) to which [he] or [his] sales team(s), if any, were assigned or had responsibility; (b) where [he] solicited sales from, made sales to, or provided services to CUSTOMERS; or (c) the geographic area where sales were made on which [he] earned commissions or other compensation on, or promoted or marketed any products or services to, during the last eighteen months of [his]

employment"); and defines the term CUSTOMER as "any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences, or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which [he] contacted, solicited any business from, sold to, rendered any services to, [was] assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of [his] employment."  (Ex. A at p. 2; *see also id.* at p. 1 (defining the terms COMPANY and CONFIDENTIAL INFORMATION).)  During and after Gore's employment with DePuy Synthes, Gore's now current employer and/or distributorship and the companies whose products he distributes and sells are each a COMPETITOR within the Agreement's definition of that term.

29.     As to his restrictions on interference with DePuy Synthes' customer relations, the Agreement provided that Gore, "during [his] employment and for eighteen (18) months after the termination of [his] employment (whether voluntary or involuntary)…shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by [DePuy Synthes]; (b) if [he is] working with, for, or as a COMPETITOR or [DePuy Synthes]; and/or (c) if [his] activities could damage or interfere with the CUSTOMER relationships of [DePuy Synthes] or divert business from such CUSTOMERS to a COMPETITOR."  (Ex. A at ¶ C(7).)  The Agreement further provided that Gore "shall not in any way disparage…[DePuy Synthes or its] employees, products or services to any CUSTOMER

11

including, without limitation, taking any action or making any derogatory statement the intent or reasonably foreseeable effect of which is to impugn or injure the reputation or goodwill" of DePuy Synthes.  (Ex. A at ¶ C(9).)

30.     Based on Gore's territorial and coverage responsibilities and the compensation paid to him during and in connection with his employment with DePuy Synthes, the Agreement's territory-based and customer-based restrictions encompass, among other customers, the following accounts in Territory 401 and all their affiliated physicians and staff, some of which have privileges and responsibilities outside of Territory 401:

- Baptist Health System;

- Baptist Medical Center;

- Christus Santa Rosa Healthcare;

- Christus Santa Rosa Hospital – Alamo Heights;

- Christus Santa Rosa Physicians Ambulatory Surgery Center;

- Cumberland Surgical Hospital;

- Doctors Hospital of Laredo;

- Fort Duncan Medical Center;

- Laredo Medical Center;

- Methodist Ambulatory Surgery Center;

- Metropolitan Methodist Hospital;

- Methodist Hospital South;

- Methodist Specialty and Transplant Hospital;

- Nix Hospital Systems LLC;

- North Central Baptist Hospital;

- Northeast Baptist Hospital;

12

- Northeast Methodist Hospital;

- Orthopaedic Surgery Center of San Antonio;

- Pasteur Plaza Surgery Center;

- St. Luke's Baptist Hospital;

- San Antonio Surgery Center;

- Southwest General Hospital;

- Southwest Texas Methodist Hospital; and

- Val Verde Hospital.

31.     The Agreement also provides that, "for a period of twelve (12) months after [Gore's] last date of employment…[he] will not, directly or indirectly, on [his] own behalf or on behalf of others, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment."  (Ex. A at ¶ C(8).)

32.     In order to ensure compliance with the obligations in the Agreement and provide transition services adequate to protect DePuy Synthes' business and ensure coverage for surgical cases and continuity of patient care, the Agreement also required that Gore provide two-weeks' advance notice of his resignation and two-weeks' advance notice of any changes in future employment through the expiration of his post-termination contractual obligations:

> "For purposes of enabling [DePuy Synthes]…to monitor [his] compliance with [his] obligations under th[e] Agreement, [he] will notify [DePuy Synthes] in writing, at least two weeks before [his] last date of employment with [DePuy Synthes], and provide at least two weeks advanced written notice whenever within the eighteen (18)-month period following the termination of employment [he] plan[s] to commence work with a new entity or person of: the identify of each entity or person for which [he] will be working, [his] new title, and the responsibilities of the position (such as the products and/or services [he] will be working on for the new entity or person, and any territory [he] may cover).  During this time period [he] will also provide such notice regarding any planned or actual changes in [his] work responsibilities.  [He] will promptly provide any additional information

13

requested by [DePuy Synthes] to determine compliance with [his] obligations under th[e] Agreement."

(*See* Ex. A at ¶ C(10).)

33.     To further facilitate transition of services, Gore agreed in the Agreement that, "[d]uring any notice period, [he] will provide such transitional services as [DePuy Synthes] may request" and that "THERE SHALL BE, AT [HIS] EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER [HE] GIVE[S] WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE."  (Ex. A at ¶ C(28).)  During that time, DePuy Synthes "will be obligated to continue [his] pay…and [his] duty of loyalty to [DePuy Synthes] will continue through such period."  (Ex. A at ¶ C(28).)

34.     Gore also acknowledged that the information sought in the advance notices required by the Agreement could be used "to evaluate [his] compliance with [his] obligations under th[e] Agreement, to enforce those obligations, and to seek remedies for [his] breach or another party's interference with [his] obligations under th[e] Agreement."  (Ex. A at ¶ C(10).)

35.     Gore acknowledged in the Agreement that if he were to "violate or [was] about to violate" the Agreement, "immediate irreparable injury…will result, warranting (in addition to any other relief) the imposition of injunctive relief against [him] without the necessity of posting any bond."  (Ex. A at ¶ C(13).)

In the Agreement, Gore also expressly acknowledged and agreed that he was subject to a duty of loyalty to DePuy Synthes and to a list of conduct prohibited during his employment with DePuy Synthes:

> During [his] employment, while [he] may investigate other employment or business opportunities, [he] acknowledge[s] and agree[s] that [he is] subject to a duty of loyalty.  Therefore, [he] agree[s] that during [his] employment, [he] will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair [DePuy Synthes'] business or relationships with its CUSTOMERS; inform CUSTOMERS that [he is] terminating [his] employment

and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of [his] EMPLOYER or any COMPANY to join a COMPETITOR.

(*Id.* at ¶ C(21).)

### Gore's Pre- and Post-Resignation Competitive Activities

36.     Gore voluntarily resigned his employment with DePuy Synthes in writing on August 3, 2018, stating to his Regional Manager at the time:

Please accept this letter as my formal notice of resignation from DePuy Synthes as Trauma Sales Representative for territory 401, effective August 17th, 2018.  I hope that two weeks is adequate time to allow for a smooth transition.

I will be taking on a new role with a smaller company to allow me to focus more time on me and my family.  Please reach out to me if I can be of any help during this time.

And, despite the plan he had developed to compete against DePuy Synthes, Gore closed his resignation notice stating, "I wish you and your team good fortune and success moving forward."

37.     In follow-up conversations with his then Regional Manager, Gore obfuscated, at times denying he had secured any actual new role or contract engagement, and at other times representing he would be taking on entirely new roles such as that of a physician recruiter, and at other times representing more clearly (but falsely) that he would be working for a distributor in a managerial role involving joint reconstruction products and with customers outside of his former DePuy Synthes territory.

38.     Although he tendered his resignation on August 3, 2018, DePuy Synthes has learned that Gore had already, by that date, engaged in competition with it and that he continued to do so through his two-week notice and transition period, in violation of his Agreement and his fiduciary obligations as a DePuy Synthes employee.

39.     Upon information and belief, Gore was involved in sabotaging DePuy Synthes' recruitment of a lateral candidate who was set to commence his employment with DePuy Synthes on or about May 7, 2018 and has, since his resignation, been working with that individual in support of Gore's coordinated activities on behalf of a competitor, at minimum Advanced Orthopedic Solutions.

40.     Also, in or around May 2018, an orthopedic surgeon customer informed a DePuy Synthes representative that he had seen key surgeon Dr. B[1] at the airport with Gore traveling to California.  Advanced Orthopedic Solutions (a competitor of DePuy Synthes) is headquartered in Torrance, CA, and, upon information and belief, the purpose of Gore's travel with that DePuy Synthes customer was competitive and in furtherance of plans to convert DePuy Synthes' business and customer relationships.

41.     Upon information and belief, Gore continued working against DePuy Synthes by soliciting key surgeon Dr. L to use competitive products, and on July 26, 2018, Dr. L performed a proximal humerus procedure at North Central Baptist Hospital using a competitive Advanced Orthopedic Solutions product.

42.     Still not finished with sabotaging DePuy Synthes, Gore, upon information and belief, solicited key surgeon Dr. W to use competitive products, and on August 2, 2018, Dr. W performed a retrograde femoral intramedullary nail procedure with Gore and a representative of Advanced Orthopedic Solutions (a competitor of DePuy Synthes) present in the operating room.

43.     Upon information and belief, Gore may have received payments from a distributor for converted cases preceding his resignation from DePuy Synthes.

---

[1] In this Complaint, DePuy Synthes employs short-form names to identify certain physician customers to protect confidential information pertaining to, among other things, the physicians' relationships and business with DePuy Synthes.

44.    Upon information and belief, Gore established a new phone number in his name to help facilitate his unlawful conduct.

45.    Around this time period, two cases of custom DePuy Synthes instruments went missing and, upon information and belief, were being used by Gore.

46.    Armed with DePuy Synthes' confidential information and building off of the competitive solicitations and conversions he had already undertaken before resigning, Gore continued to interfere with and convert DePuy Synthes' business in Territory 401 and with key surgeons from Territory 401 with privileges in neighboring areas in violation of the Agreement.

47.    For instance, immediately after Gore's last day of employment with DePuy Synthes on August 3, 2018, one of the key surgeons (Dr. B) who had previously accompanied Gore to CA immediately began utilizing competitive products, including, upon information and belief, cases in which Gore was present.  Then, upon information and belief, from on or around August 6 to 8, 2018, Gore covered competitive cases with Dr. B at Bay Area Corpus Christi Medical center, which included, at minimum, one pilon fracture procedure, two retrograde femoral intramedullary nail procedures, and a hip fracture intramedullary nail procedure.

48.    In addition to his solicitation and conversion of business with Dr. B, Dr. L, and Dr. W, upon information and belief, Gore also solicited key surgeon Dr. G to use competitive products, and on August 7, 2018, Dr. G performed a hip fracture intramedullary nail procedure at Baptist Downtown on behalf of a competitor.

49.    Gore has continued to solicit, convert, and support customers from his former DePuy Synthes territory and has, upon information and belief, continued to coordinate those activities with others, despite multiple written reminders of his obligations and demands that he cease and desist.

17

50.     On August 24, 2018, DePuy Synthes' counsel sent a letter to Gore reminding him of his obligations, seeking information and assurances regarding his post-employment role, and "reserv[ing] all rights and remedies related to the termination of [Gore's] employment with DePuy Synthes and [his] compliance with [his] contractual, common law, and statutory obligations to DePuy Synthes."  That letter also expressly identified some of the key accounts and surgeons to which the post-employment obligations in the Agreement apply, including the very surgeons and accounts Gore and his co-conspirators have targeted and converted.

51.     Gore responded to that August 24, 2018 letter in writing and, on September 14, 2018, claimed not to be employed at all and stated that he was "weighing his options outside of San Antonio."

52.     Contrary to Gore's representations in that correspondence, DePuy Synthes learned Gore covered at least one case at Northeast Methodist on behalf of a competitor and that Gore was seeking to secure the credentialing necessary for him to support Parallon accounts, including the Methodist health system.  DePuy Synthes' counsel then sent a cease and desist letter to Gore on October 16, 2018, again "reserve[ing] all rights and remedies with respect to the conduct set forth in prior correspondence and [t]herein."

53.     Gore initially responded to that letter through counsel on October 24, 2018, representing that "Mr. Gore has no intention at all of violating any agreement," and in a subsequent letter on October 30, 2018, Gore's counsel represented that "Gore's new employment is with Legent Medical System" in a "material management role in which he evaluates implants and their pricing as it pertains to surgeries, including orthopedics," and denied the unlawful conduct identified in DePuy Synthes' counsel's prior correspondence to Gore.  Gore's October 30, 2018

letter again represented that "Gore has no intention of violating any agreement he made with DePuy."

54.     Upon information and belief, Gore continued to violate the Agreement in contradiction of the representations made in the October 30, 2018 letter from his counsel, and, upon information and belief, he continues to violate the Agreement, including through his more recent distribution and support of competitive ZimmerBiomet products beginning in April 2019, at the latest.

55.     In addition, upon information and belief, Gore has used or caused to be used DePuy Synthes' instrumentation during cases at his former accounts, which raises significant compliance risks and liability concerns, among other things.

56.     Upon information and belief, Gore has also received compensation or other monies related to the business he, in conjunction with others, has worked to convert from DePuy Synthes.

57.     As a result of the foregoing conduct and, upon information and belief, other conduct he and others working in concert with him have engaged in, Gore has breached his fiduciary obligations to DePuy Synthes, interfered with and converted DePuy Synthes' valuable relationships with customers, including surgeons, from Gore's former DePuy Synthes sales territory and DePuy Synthes' associated goodwill, exploited DePuy Synthes' confidential and trade secret information, and deprived DePuy Synthes of the protections warranted in exchange for its investments in Gore's training and education.

58.     Gore's unlawful activities have caused significant damage to DePuy Synthes, including, among other things, financial harm and damages caused by the conversion of DePuy Synthes' business in Gore's former DePuy Synthes sales territory as well as substantial and

irreparable harm to DePuy Synthes' customer relations and goodwill and by his exploitation of DePuy Synthes' confidential and trade secret information.

59.     Gore and those acting in concert with him have also been unjustly enriched by this unlawful conduct, and that harm, damages, and unjust enrichment will continue.

60.     DePuy Synthes files this Complaint to remedy the harms caused by Gore's unlawful activities through, among other remedies, an award of compensatory and punitive damages, attorney's fees and costs, disgorgement, an accounting, and all other appropriate legal and equitable relief.

## COUNT I
### (Breach of Fiduciary Duty / Duty of Loyalty)

61.     DePuy Synthes incorporates and re-states the averments set forth in the preceding paragraphs of this Complaint as though set forth herein and at length.

62.     In addition to and/or in the alternative to Count II, during his employment with DePuy Synthes, including during the two-week notice and transition period following the submission of his notice of resignation, Gore owed DePuy Synthes a duty of the utmost good faith, undivided loyalty, diligence, and faithful service and a duty to place DePuy Synthes' interests above his own and above the interests of any competitor and not to act for persons, entities, or purposes whose interests would conflict with those of DePuy Synthes.

63.     Disregarding those duties, as alleged herein, Gore purposefully diverted his efforts during his employment with DePuy Synthes toward:

- the conversion of DePuy Synthes' customers and business, including by, among other things, arranging meetings with key surgeons, soliciting customers regarding and for the benefit of competitors and attending at least one case in which a competitor's products were used;

- using DePuy Synthes time and resources, customer relationships and goodwill in order to benefit and develop his post-resignation plans;

- communicating with DePuy Synthes' customers in his former territory about competitive products, at minimum; and

- sabotaging, at minimum, DePuy Synthes' recruitment of a lateral hire with whom DePuy Synthes now understands Gore to have been working in violation of his obligations.

64.     Gore was bound to act in good faith and with due regard to the interests of DePuy Synthes while employed by DePuy Synthes, but he instead acted for his own interests and to injure DePuy Synthes in its business.

65.     DePuy Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of Gore's disloyal and tortious conduct.

66.     Gore's disloyal and tortious conduct is a direct and proximate cause of DePuy Synthes' damages and harm.

67.     Gore and others with whom or with which he has acted in concert as part of his unlawful scheme have been unjustly enriched as a result of Gore's disloyal and tortious conduct.

## COUNT II
### (Unjust Enrichment)

68.     DePuy Synthes incorporates and re-states the averments set forth in the preceding paragraphs of this Complaint as though set forth herein and at length.

69.     In addition to and/or in the alternative to Count II, Gore and others with whom or with which he has acted in concert have, as part of his unlawful scheme, directly and substantially harmed DePuy Synthes and, at the same time, have been unjustly enriched as a result of Gore's disloyal and tortious conduct.

70.     It would be unjust and wrongful for Gore to retain the benefits he obtained as a direct result of his disloyal and tortious conduct.

## COUNT III
### (Breach of Contract)

71.     DePuy Synthes incorporates and re-states the averments set forth in the preceding paragraphs of this Complaint as though set forth herein and at length.

72.     The Agreement is valid and enforceable.

73.     At all material times, Gore was aware of his pre-termination and post-termination obligations under the terms of the Agreement.

74.     DePuy Synthes has fulfilled its obligations and fully performed under the Agreement.

75.     During his employment, Gore was contractually prohibited from (i) using or disclosing DePuy Synthes' Confidential Information other than for purposes of supporting DePuy Synthes; (ii) competing with DePuy Synthes to benefit a competitor; and (iii) interfering with DePuy Synthes' relationships with customers and employees.  In addition to, or in the alternative to, Count I, Gore violated those contractual obligations.

76.     After his employment, Gore was contractually prohibited from (i) using or disclosing DePuy Synthes' Confidential Information; (ii) competing with DePuy Synthes, as set forth in the Agreement; and (iii) interfering with DePuy Synthes' relationships with customers or employees, and he was also required to provide notice of his employment role and changes in it. Gore has violated each and all of those obligations, and will, upon information and belief, continue to do so through the restricted period, and will, upon information and belief, continue to be unjustly enriched by that unlawful conduct well after the applicable restricted periods.

77.    Gore's targeting, contact with, solicitation of, and servicing of customers from his former DePuy Synthes territory directly himself and/or in coordination with others, his dependence upon, use, and disclosure of DePuy Synthes' Confidential Information, and his refusal to provide accurate, timely information regarding his post-resignation role and responsibilities despite demands for the information constitute violations of his pre-termination and post-termination contractual obligations to DePuy Synthes as set forth in the Agreement.

78.    Gore's unlawful activities were undertaken and continue to be undertaken in direct violation of his contractual obligations to DePuy Synthes, facilitated by his direct and indirect exploitation of the Confidential Information to which he had access as a DePuy Synthes employee, including, but not limited to, information regarding DePuy Synthes' sales and marketing strategies; distribution details; business planning and development; pricing, sales volume and strategies; purchasing histories; inventory allocation and customer preferences and needs; product development projects, acquisitions, and launches; personnel information such as compensation and plans with respect to territory or team alignments or expansions and recruiting activities; and other categories of information.

79.    Gore's past, ongoing, and future use and disclosure of DePuy Synthes' Confidential Information and targeting, support, and conversion of DePuy Synthes' customers from his former territory have caused substantial harm to DePuy Synthes, including not only the reduction of DePuy Synthes' market share in and around San Antonio but also the conversion of business with DePuy Synthes' customers in his former territory and the resulting loss of DePuy Synthes' past and future sales to those customers.

80.    The harm and damages caused by Gore's unlawful conduct to date will only worsen and accumulate over time as he directly and indirectly through others persists in this unlawful

conduct, and portions of the harm caused by Gore's unlawful conduct are irreparable, are not susceptible to quantification or calculation, cannot be fully addressed through any legal, monetary remedy, and may be compensated fully only through an award of additional equitable remedies.

## JURY DEMAND

DePuy Synthes hereby demands a trial by jury on any issue so triable by right.

## PRAYER FOR RELIEF

WHEREFORE, DePuy Synthes demands judgment in its favor and against Gore, and respectfully requests the following relief:

- Actual damages that DePuy Synthes is entitled to recover as a result of Gore's breaches of the Agreement and breaches of fiduciary duty;

- Incidental and consequential damages as permitted by law;

- Damages in the amount of the unjust enrichment caused by Gore's unlawful conduct and/or gained by Gore as a result of his unlawful conduct;

- Exemplary and/or punitive damages as permitted by law;

- Specific performance and/or injunctive relief prohibiting Gore from violating the terms of the Agreement and extending the obligations in the Agreement;

- Specific performance and/or injunctive relief requiring the return of all DePuy Synthes property, including, but not limited to, Confidential Information, in Gore's possession, custody, or control;

- Specific performance and/or injunctive relief restricting Gore's possession, access to, and use or disclosure of Confidential Information;

- Injunctive relief restricting Gore's employment with or activities on behalf of a competitor;

- Injunctive relief restricting Gore and any individual or entity acting in concert with him from soliciting, contacting, or providing services to customers from Gore's former DePuy Synthes sales territory;

- Equitable relief pertaining to any ill-gotten gains and unjust enrichment, including, but not limited to, an accounting, disgorgement, and imposition of a constructive trust;

- The costs of these proceedings;

- DePuy Synthes' attorneys' fees and costs incurred in this matter; and

- All such other relief as this Court deems appropriate.

Dated:  October 4, 2019                    Respectfully submitted,

**BLANK ROME LLP**

*/s/ Domingo Manuel LLagostera*
Domingo Manuel LLagostera (TBN: 24070157)
717 Texas Avenue, Suite 1400
Houston, TX 77002
Tel.:    (713) 632-8682
Fax.:    (713) 228-6605
Email:  dllagostera@blankrome.com

-and-

*pro hac vice applications to be submitted*

Anthony B. Haller (Pa. I.D. No. 37017)
Kevin M. Passerini (Pa. I.D. No. 203169)
One Logan Square
Philadelphia, PA  19103
Tel.: 215.569.5690/5466
Fax: 215.832.5690/5466
Email: haller@blankrome.com
           passerini@blankrome.com

*Attorneys for Plaintiff DePuy Synthes Sales, Inc.*